UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM NO. 3:24CR12 (VAB) |
| v. | |
| JAMES KEATING | December 30, 2024 |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Over a period of about four years, from 2017 to January 2021, the defendant James Keating defrauded his employer, Allied World National Insurance Company, out of nearly $1.5 million. He executed his fraud scheme through multiple complex schemes, wherein he used shell companies to (1) bill Allied World for fraudulent invoices for surety completion work that was not performed; (2) demand and take kickbacks from Allied World vendors; and (3) overcharge Allied World for certain services without telling Allied World that he was the owner of the company providing those services. The defendant acted not out of dire financial need, but used the criminal proceeds to fund home renovations, a new pool, cars, and his golf club membership, among other things. Worse yet, he committed his fraud by breaching the trust Allied World had placed in him, as an Assistant Vice President and claims handler, and exploiting his close working relationships with his colleagues. In his wake he left not just a large financial loss, but a company and colleagues that still struggle to recover from the effect of the defendant's crime. And, while the Court should consider the defendant's history, mental health, and other personal characteristics, those factors should not shield him from accountability for his fraud and the profound impact it had on his victim. The Court should, therefore, sentence the defendant to a substantial term of imprisonment commensurate with the seriousness of his crime.

I.   Introduction and Background

   A. Procedural History

On January 16, 2024, a grand jury in New Haven returned an indictment charging defendant James Keating with ten counts of wire fraud, in violation of 18 U.S.C. § 1343. The defendant self-surrendered and appeared in the Eastern District of Pennsylvania on January 18, 2024, was released on a $100,000 unsecured appearance bond, and was ordered to appear on January 25 in the District of Connecticut. On January 25, 2024, the defendant appeared before United States Magistrate Judge Thomas O. Farrish, was arraigned, and again released on a $100,000 unsecured appearance bond. On July 30, 2024, the defendant appeared before this Court and pleaded guilty to Count One of the Indictment. The defendant pleaded guilty pursuant to a plea agreement that, among other things, included a Sentencing Guidelines stipulation in which the parties agreed that the advisory sentencing range is 41 to 51 months' imprisonment (assuming the defendant is in Criminal History Category I). The defendant also agreed to pay restitution in the amount of $1,226,603.97, which represents the loss to Allied World from the charged fraud ($1,446,491.95) less $219,887.98 repaid by the defendant as part of a civil judgment.

   B. Summary of the Facts

A fulsome summary of the offense conduct is set out in the PSR at ¶¶ 7-20, which the Government incorporates by reference and substantially restates or summarizes here.

*The Fraud*

Between 2017 and January 2021, while an Assistant Vice President at Allied World National Insurance Company and then its affiliate Crum and Forster, the defendant defrauded Allied World out of just under $1.5 million. He carried out the scheme in two principal ways.

First, the defendant billed Allied World for surety completion work that was never performed and was unnecessary and took the proceeds for himself. In this part of the scheme, the defendant created a shell company, American Construction & Industrial LLC ("American Construction"), under the assumed name of Robert Peterson. In truth, American Construction was solely owned by the defendant, who created it for the purpose of defrauding Allied World. In many cases, the defendant caused American Construction to bill Allied World for tasks that the defendant was obliged to provide as an Allied World employee. The defendant did not inform Allied World that American Construction was his alter ego. The defendant repeatedly created and uploaded claims into Allied World's system purporting to show that American Construction had contracted to perform work, and did perform work, on particular claims, when in fact: (a) American Construction had not performed such work, (b) such work was not necessary, (c) such work was within the defendant's employment obligations, and/or (d) the defendant failed to inform Allied World that he solely owned American Construction, as required by company policy.

Allied World then paid American Construction for these bogus invoices, and the money was deposited into bank accounts controlled by the defendant, who then used it for his own enrichment. In total, the defendant fraudulently caused Allied World to pay American Construction on at least 51 occasions a total of $984,250.

Second, the defendant defrauded Allied World by soliciting and receiving kickbacks from vendors who performed work on Allied World claims handled by the defendant, and then failing to disclose those kickbacks to his employer, Allied World. Here, the defendant again utilized a shell company, Surety Risk Solutions, LLC, also known as SRS and SR5 LLC (collectively "SR5"). SR5 was solely owned by the defendant.

The defendant caused SR5 to enter arrangements with Allied World vendors under which the vendors would pay a percentage of their revenue from Allied World work to SR5, typically between 7 and 10 percent. The defendant did not inform Allied World that he was soliciting its vendors for a percentage of their receipts, nor did he pay over those receipts to Allied World, instead taking the kickbacks for his own enrichment. The defendant solicited at least one of those vendors to pay undisclosed kickbacks related to work the vendor did for a prior employer of the defendant.

Additionally, the defendant caused these vendors to utilize Kodiak Asset Recovery LLC, a company also partly owned by the defendant, to do online asset searches and then vastly overcharge Allied World for that service, again without telling Allied World about his ownership interest in Kodiak.

In total, the defendant received $356,942.92 in kickbacks through SR5 from three Allied World vendors, two of which were law firms and the other a consulting firm. The principal of one of the law firms was a classmate of the defendant at Delaware Law School-Widener University. At least $337,692.73 of those kickbacks related to Allied World work, and $19,250.19 related to work those vendors performed for prior Keating employers. Keating also received $124,549.22 from Allied World through Kodiak Asset Recovery. Thus, the total loss caused by the defendant is $1,465,742.14, of which $1,446,491.95 is due to Allied World.

*Discovery and Civil Suit*

The defendant's scheme was discovered when Crum & Forster noticed irregularities in payments to American Construction. The company investigated, and discovered the American Construction fraud as described above. Keating was confronted, and he denied any fraud and claimed that Robert Peterson was ill. He opted not to attend a follow-up meeting. A civil

complaint was filed by Allied World against Keating on January 15, 2021, under Case No. 3:21-cv-58. Judgment was entered in favor of Allied World on January 10, 2024, awarding actual damages of $967,750 and treble damages of $2,903,250, for a total of $3,871,000. Keating has paid $219,887.98, which the Government agrees should be credited against his criminal restitution obligation.

*Use of Stolen Funds*

A review of records revealed that almost all the Allied World funds that the defendant stole using American Construction were, in turn, transferred by him to the SR5 account. That same SR5 account received substantially all of the funds Keating obtained via the kickback scheme and from Kodiak. In total, $1,709,395.28 was deposited into the SR5 account, which included almost all the $1,446,491.95 that the defendant stole from Allied World in the ways described above.

The defendant's disposition of funds from the SR5 account included: (1) $275,480.35 in cash withdrawals, over 504 transactions averaging $550 each; (2) $660,246.90 in personal checks written for the defendant's benefit; (3) $205,131.43 to pay JP Morgan Chase credit card bills; (4) $144,210.55 to pay Citicard credit card bills; (5) $72,894.09 to pay the Chester Valley Golf Club, a private club near the defendant's home; (6) $10,359.88 to Alta Surf; and (7) $341,071.08 to other payees. Among other notable personal expenditures were a $19,257.38 check to Sterling Kitchens, with a memo line including Keating's home address; a $17,485.67 check to Keystone Motors, with a memo line of "2015 VOLVO 560"; a $12,000 check to Chambers & Sons LLC with a memo line of "Keating Landscape Project"; an $11,641.93 check to Gerhard's (which is a kitchen and home appliance store), with a memo line including the defendant's home address; and numerous other substantial checks including payees and/or memo lines indicating payments for kitchen and

other home renovations, pool installation, wedding expenses, camp tuition, vacations, college savings accounts, and federal income taxes.

II.     Sentencing Guidelines

The Probation Office and the parties, in the plea agreement, are in accord over the application of the Sentencing Guidelines. The plea agreement states:

> The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.
>
> The defendant's base offense level under U.S.S.G. § 2B1.1 is 7. That level is increased by 14 levels because the loss from the offense is greater than $550,000 and less than $1.5 million. § 2B1.1(b)(1)(I). That level is further increased by two because the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. § 2B1.1(b)(10)(C). That level is further increased by two because the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense. §§ 2B1.1(b)(17)(A), 2B1.1 cmt. n. 1 (defining "financial institution" to include an insurance company). Two levels are added because the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense. § 3B1.3. Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 24.
>
> Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category I. Similarly, the parties agree that, based on an initial assessment, the defendant qualifies for a two-level reduction for "certain zero-point offenders" under U.S.S.G. § 4C1.1, which would further reduce the defendant's total offense level to 22. The parties reserve the right to recalculate the defendant's Criminal History Category, eligibility for a zero-point-offender reduction, and corresponding sentencing ranges if this initial assessment proves inaccurate.
>
> A total offense level of 22, assuming placement in Criminal History Category I, would result in a Guidelines range of 41 to 51 months of imprisonment (sentencing table) and a fine range of $15,000 to $150,000 (U.S.S.G. § 5E1.2(c)(3)). The defendant also is subject to a supervised release term of 1 year to 3 years. U.S.S.G. § 5D1.2.

The Government continues to agree with this calculation, including the defendant's placement in Criminal History Category I.

III.     Sentencing Factors

Consideration of the Guidelines and the statutory factors in 18 U.S.C. § 3553(a)(2) demonstrate that this is a serious crime warranting a substantial term of imprisonment, even in light of the history and characteristics of this defendant, *see* 18 U.S.C. § 3553(a)(1).

A.  Seriousness of the Offense, Respect for the Law, and Just Punishment

By far the most significant consideration that calls for a substantial punishment in this case is the seriousness of the offense. This case was not a momentary lapse in judgement, but a sustained, four-year-long, multi-faceted scheme to steal nearly $1.5 million from an employer that had placed its trust in the defendant to carry out a substantial amount of business with minimal supervision. Several factors in particular augur for a substantial prison sentence.

*First*, the defendant's crime is serious because of its sheer size, duration, and complexity—nearly $1.5 million in actual loss over about four years, employing three different cons at the same time, each con spread over dozens of transactions, and employing three different shell companies to hide the defendant's theft from his employer. Indeed, each con was itself complex and distinct from the other—a fraudulent invoicing scheme using American Construction, a kickback scheme using SR5 that exploited vendor relationships, and then using Kodiak to overcharge Allied World for services without revealing he was in control of that company as well. This was not an isolated failure of judgment, but a sustained scheme whereby the defendant knowingly and repeatedly placed his own well being above that of his employer and his colleagues.

*Second*, the defendant's crime is serious because he betrayed the significant trust Allied World placed in him. It is hard to fault Allied World for placing the defendant in that position—he was a licensed attorney in good standing and a veteran of the surety insurance industry with no prior history of malfeasance. Indeed, Allied World explained that it "specifically hires attorneys

7

for its claims-handling positions, in part because of the higher ethical standards they must hold. Mr. Keating breached these duties to the legal system, just as he breached his duties to Allied World." Victim Impact Statement ("VIS") at 4. The defendant's breach of trust was more insidious than in a typical embezzlement case, where an executive simply steals money. Instead, he made his managers and colleagues unwitting accomplices to his crime, causing them to process his fake invoices and then, when they pushed back against irregularities, "belittling [their] concerns" and "telling them that they did not know anything about the surety space." VIS at 3. The defendant well understood that he necessarily had a great deal of discretion to resolve surety claims, and his managers had to trust him to operate honestly within that mandate. *See* VIS at 2 ("As Kelly has said, in order to do her job, she needs to trust people—and she trusted Jim."). Beyond that, the defendant exploited years-long close relationships with colleagues who trusted him and would have no reason to expect him to be a fraudster.

*Third*, and related to his breach of trust, the defendant's crime had a profound impact on Allied World and its employees that goes far beyond stolen funds. Allied World explains in its impact statement that "[f]ar more serious than the harm Mr. Keating caused Allied World is the harm he caused to his colleagues." VIS at 2. Indeed, the Court should take care not to discount the impact of the crime because the defendant stole from a company rather than people. The revelation of the defendant's four-year-long fraud has caused his colleagues to fault themselves for not catching him; take undeserved personal responsibility for the havoc wrought by the defendant; and approach their jobs and personal life with more suspicion and less trust. Allied world has spent significant additional resources investigating the defendant's frauds and has had to put in place "extra prophylactic measures" that "have had a chilling effect on the morale of

8

Allied World's employees, who are faced with procedures that suggest their employer does not trust them." VIS at 1.

*Fourth*, the seriousness of the crime is exacerbated by the greed and selfishness the defendant displayed. While the defendant obviously had experienced financial stressors in his life, including a bankruptcy filing several years prior, this crime is not one that can be chalked up to dire need. Allied World paid the defendant around $170,000 annually, more than he made before or since the crime. Accordingly, it does not appear that the defendant stole to put food on the table for his children or siblings. Instead, records show that the diverted funds were often used for luxuries such as vehicles, a golf club membership, kitchen and other home renovations, pool installation, camp tuition, and vacations. PSR ¶ 20. The defendant emphasizes the "intense pressure" of having to keep up with the lifestyles of their neighbors in Paoli. Defendant's Sentencing Memorandum ("Def. Sen. Mem.") at 13. Even if true—and he made well over the median household income[1]—this is hardly a stressor warranting much sympathy in the context of sentencing for stealing almost $1.5 million. As the defendant himself acknowledges, "[m]any people face difficult financial situation and do not commit crimes. I did." Def. Mem. Ex. K at 1.

While the defendant's sentencing memorandum claims to acknowledge the seriousness of his offense and the "full ramification of his actions," Def. Mem. at 30, his request for a sentence of probation tells a different story. The defendant claims that his four-year, nearly $1.5 fraud and his betrayal of Allied World and his former colleagues are adequately punished by the collateral consequences that he has already faced—loss of employment and income, reputational harm, felon status, and emotional struggles. Def. Mem. at 30-31. But such "punishments" are attendant to

---

[1] *See* U.S. Census Profile Page, available at https://data.census.gov/profile/Paoli_CDP,_Pennsylvania?g=160XX00US4257816 (last visited December 29, 2024).

almost all felony offenses and befall this defendant in no more or less a substantial way than any others. To excuse the defendant from meaningful prison time because of these self-inflicted collateral consequences would inappropriately and unjustly single out this defendant for leniency, which is precisely what the Guidelines are meant to avoid. In fact, the defendant's memorandum seems inconsistent with his own letter, which offers a more realistic approach towards the appropriate punishment for his crime. The defendant writes, "I made a huge, life altering mistake. I have fully wrapped my mind around incarceration as a reality." Def. Mem. Ex. K at 3. The defendant, using his own words, appears to recognize that "the right thing to do when someone makes a mistake" is to "stand[] ready to accept my punishment." *Id*. at 1. The defendant should be credited for acknowledging the seriousness of his offense and recognizing the need to accept his punishment. Such recognition will serve him well through the process of rehabilitation; it does not, however, absolve him of that punishment in the first place.

B. <u>Adequate Deterrence and Protection of the Public</u>

It seems unlikely—but not impossible—that the defendant poses a meaningful risk to reoffend. At a minimum, the defendant's conviction here will make it less likely (though, again, not impossible) that another employer would trust him in the way that Allied World did. That said, the defendant apparently aspires to reengage in the same fields in which he committed his fraud and betrayal. While he has voluntarily given up his law license, Def. Mem. at 31, he would like to apply for reinstatement, PSR ¶ 75. Additionally, he would like to pursue a career as a consultant in the construction industry. PSR ¶ 75.

Still, the extent and duration of this defendant's crime points to a serious flaw in his own moral and ethical calculus that will not heal quickly, nor without significant sanction from the Court. This was not true aberrant behavior. Rather, it was a series of bad choices in full view of

the consequences of his actions. That he knew that his conduct was wrongful, and the impact it would have on his colleagues, makes it all the more alarming that he engaged in it anyway. To the extent that the defendant's crime was driven by past trauma or alcoholism, it is likewise unrealistic to think that a period of outpatient mental health treatment,[2] participation in Alcoholics Anonymous, volunteer work, and a new job, has eliminated his risk to society. Indeed, the defendant's claim that he has already "taken every step to rehabilitate himself and address the root causes of his behavior," Def. Mem. at 2, in the relatively brief time since the end of his fraud, seems either wishful thinking or an admission that those root causes were not as deep-seeded as he contends. In either event, the extent and duration of the defendant's fraud augurs for caution in concluding the defendant has cured the problems that led him down a criminal path.

Even if specific deterrence is not a significant consideration, the Court should strongly consider general deterrence. Fraud by company insiders is particularly insidious. Companies must be able to delegate authority to trusted employees in order to exist, and they must be assured that society with deal seriously with violations of that trust. This is particularly true here, where the defendant betrayed not only his company and his colleagues, but also the commitments of honesty and integrity he made as a lawyer. Allied World explains they hired Keating in part because of the added layer of professionalism that should come with the distinction. A punishment in this case should reflect the seriousness society assigns to criminal activity by a lawyer, and the confidence we want the public to have in the profession.

---

[2] In his letter to the Court, the defendant reports having been in therapy for the last year, not for the entire period since the offense. *See* Def. Mem. Ex. K at 2.

C. History and Characteristics of the Defendant

In his sentencing memorandum, the defendant appropriately devotes a large part of his argument to various personal challenges he has faced, including childhood trauma, various personal and family challenges, and financial struggles. The Government is in full agreement that these factors bear meaningful consideration in reaching the appropriate sentence. However, it is less obvious either that they can explain away the defendant's conduct, or that they eliminate the need for a substantial prison sentence.

*First*, while the defendant presents a great deal of information about his past struggles, it is not at all clear which of them he assigns as the so-called "root causes" of his criminal activity, Def. Mem. at 18, or why the root causes matter in assessing the seriousness of the offense and just punishment. *See United States v. Brady*, 417 F.3d 326, 335 (2005) ("there is sparse support in the record for a finding that Brady's impaired emotional or mental condition led her to engage in a conspiracy to commit bank fraud."). That the defendant's traumas may lead to dissociative behaviors, which made it easier for him to cope with the havoc he was causing within Allied World, *see* Def. Mem. at 14-15, does not explain how he came to commit the fraud in the first place. Nor can a complex, four-year-long web of lies and deceits be explained by "moderate" alcohol use disorder. Def. Mem. Ex. A at 2. And while the defendant reports a history of "problematic gambling," PSR ¶ 73, that problem did not make it into either mental health report submitted to the Court, and there is scant detail regarding how it interacted with the defendant's crime.

*Second*, there is a notable disconnect between the defendant's letter to the Court and statements to Probation on the one hand, and his other sentencing advocacy and supporting materials (particularly the mental health reports) on the other. The defendant's own explanation

12

for his criminal activity is straightforward and unremarkable in the larger context of white-collar crime. Faced with perceived financial difficulties, the defendant explains that "when my situation grew challenging, I chose the cowardly, easy way out and committed a crime, rather than face my family or find a legitimate solution." Def. Mem. Ex. K at 2. He admits that "I blatantly stole from my employer and otherwise abused my work position for personal gain." *Id*. His letter does not assign blame to past family trauma; just the opposite, he claims to have "reflected on how my actions contradict the values I was raised with and the person I am." *Id*. at 3. Likewise, he does not strain to weave together psychiatric evaluations to explain his offense conduct, but acknowledges he stole for personal gain.

Of course, even the defendant's acknowledgement of the seriousness of his offense conduct leaves unanswered questions. He writes that "[m]y jealousy, anger, and greed got the better of me for a long time, which all culminated in this moment." Def. Mem. Ex. K at 1. His greed is obvious from the records, which show him spending criminal proceeds on cars, golf, and home renovations, among other things. But it is less clear how jealousy and anger motivated him, or whether and how that was directed at his Allied World colleagues. Moreover, while the defendant's reference to his "challenging" situation and having to "face [his] family," while unstated in the letter itself, appears to be a reference to a struggle to maintain their lifestyle, Def. Mem. at 14, and not a concern over feeding his family or a potential return to bankruptcy. The defendant's letter, then, hits on a critical point that exacerbates the seriousness of the crime—the defendant's fraud was not one borne of real financial need. And while the defendant wants to blame his decision solely on his reluctance to admit his financial situation to his wife, it seems likely that he also wanted to maintain their lifestyle for his own sake. This is consistent with the complexity of the fraud, which managed to elude his colleagues for several years, and suggests that the defendant was not (notwithstanding

his letter's Dostoyevsky reference) simply waiting to be caught. Instead, this was a sophisticated and well-thought-out crime by a sophisticated defendant.

Finally, the defendant's apparent contrition and regret regarding his conduct towards Allied World and his former colleagues rings hollow when taken in the context of his behavior in the aftermath of the end of the scheme. Allied World writes that the defendant never came clean to them about his conduct, even "after being confronted with incontrovertible evidence of his crimes." VIS at 4. Similarly, he refused to assist Allied World in cleaning up the mess he made, VIS at 1, and instead "forced Allied World to litigate for years to identify his network of shell companies and bank accounts," VIS at 4.

IV.   Additional Responses to Defense Arguments

In addition to personal history and circumstances, as discussed above, the defendant offers three principal appeals for a non-Guidelines sentence or departure.

First, the defendant asks for a departure or variance based on his mental and emotional condition. Def. Mem. at 24-27. But, as discussed above, the defendant does not explain how his past traumas led to him committing a four-year-long fraud. *See Brady*, 417 F.3d at 335. While the Government is supportive of a mental health treatment condition of supervised release, it must come after the defendant serves out a meaningful and just term of incarceration.

Second, the defendant claims that incarceration for a first-time offender would be, on its face, disproportionate. This blanket assertion runs counter to the Guidelines themselves, which suggest meaningful prison sentences even for first time offenders who have committed sufficiently serious offenses. That the defendant has no criminal history points has historically been a factor on which courts downwardly varied, but that fact is now accounted for by § 4C1.1's zero-point-offender reduction.

14

Third, while the defendant has seemingly made strides towards rehabilitation, they are hardly "extraordinary." Def. Mem. at 28. The Court should credit the defendant with attempting to improve himself, but the defendant has not done much more—including a year of outpatient therapy, Alcoholics Anonymous, finding work, and not committing more fraud—than ought to be expected of anyone who has been caught committing a crime and awaits punishment.[3]

V.      Restitution and Forfeiture

The Court should order the agreed-upon restitution of $1,226,603.97, which represents the loss to Allied World from the charged fraud ($1,446,491.95) less $219,887.98 repaid by the defendant as part of a civil judgment.

---

[3] The defendant was aware of this investigation for years prior to his plea.

VI.     Conclusion

For the reasons stated above, the Government urges the Court to sentence the defendant to a substantial term of imprisonment commensurate with the seriousness of his crime.

Respectfully Submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

/s/

DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY
157 Church St., 25th Floor
New Haven, Connecticut 06510
Tel. (203) 821-3700
Federal Bar No. phv02874

CERTIFICATE OF SERVICE

       This is to certify that on December 30, 2024, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/
_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY